**LA RAZA UNIDA et al., Plaintiffs,**

v.

**John A. VOLPE et al., Defendants.**

**No. C–71–1166.**

United States District Court,
N. D. California.

Oct. 19, 1972.

J. Anthony Kline, Ellen Cummings, Public Advocates, Inc., San Francisco, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty., Francis B. Boone, Asst. U. S. Atty., San Francisco, Cal., Harry S. Fenton, Robert F. Carlson, Kingsley T. Hoegstedt, Sacramento, Cal., John P. Horgan, Norval Fairman, Robert R. Buell, Donald M. Velasco, San Francisco, Cal., for defendants.

David M. Balabanian, and John Curran Ladd, San Francisco, Cal., for amicus curiae, Barristers Club of San Francisco.

## MEMORANDUM OF DECISION

PECKHAM, District Judge.

Plaintiffs in this environmental protection and housing assistance case originally brought suit to enjoin the construction of California Highway Project 238.[1] The injunction was granted on the grounds that the defendants failed to comply with § 4(f) of the Department of Transportation Act of 1966 and various sections of 23 U.S.C. dealing with housing displacement and relocation. Plaintiffs now move for the awarding of attorneys' fees, against defendants, the California Highway Department, California Department of Public Works, and J. A. Legarra, Chief Highway Engineer, State of California, in his individual and representative capacity.

■ While the general American rule is that attorneys' fees are not ordinarily recoverable as costs absent an express statutory authorization, the courts have developed exceptions to this rule for situations in which "overriding considerations" indicate the need for such a recovery. Mills v. Electric Auto-Lite, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).[2] The statutes which were the

---

1. See La Raza Unida, et al. v. Volpe, et al., 337 F.Supp. 221 (N.D.Cal.1971).

2. Several commentators have argued for either a major revision or an outright rejection of this rule. See Ehrenzweig, "Reimbursement of Counsel Fees and the Great Society," 54 Calif.L.Rev. 792 (1966); Juenzel, "The Attorney's Fee: Why Not a Cost of Litigation?" 49 Iowa L.Rev. 75 (1963); McCormick, "Counsel

basis of the relief on the merits in *La Raza* do not specifically provide for the awarding of fees; hence, we must consider whether this case falls within a judge-created exception to the American rule.

■ The *power* to grant attorneys' fees springs from the equitable powers of the court. Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). The basic issue in the present motion is whether plaintiffs have demonstrated that equity compels the awarding of fees in this case. Through the use of their equitable powers courts have carved out several exceptions to the American rule of *not* granting attorneys' fees absent statutory authorization.

■ 1) The "obdurate behaviour" situation. Here the courts use their equitable powers to impose costs on defendants who behaved in bad faith. See, *e. g.*, Kahan v. Rosenstiel, 424 F.2d 161, 167 (3rd Cir. 1970), cert. denied, Glen Alden Corp. v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972).

■ 2) The "common fund" situation. Here the courts use their equitable powers to insure that the beneficiaries of litigation are the ones who share the expense. This is a defensive use of the equitable power of the courts to prevent the unjust enrichment of "free riders". See, *e. g.*, Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

■ 3) The "private attorney general" situation. Here the courts use their power offensively when necessary and appropriate to insure the effectuation of a strong Congressional policy. See *e.g.*, Sims v. Amos, 340 F.Supp. 691 (M.D. Ala. decided March 17, 1972); *cf.* Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

Doubtless some cases defy categorization into one of the three categories, perhaps the present case is one, but the categories provide useful tools for analysis.

1. *The obdurate behavior situation.*

The first exception, the "obdurate behavior" or "bad faith" situation, does not apply to this case. In its memorandum and order the court specifically found that the State Highway Department did not behave in bad faith:

"From the evidence thus far presented it also appears that, *despite sincere efforts,* the State has an inadequate relocation assistance program, as defined by § 205 of the Uniform Relocation Assistance Act of 1970 and IM 80–1–71. The State, *albeit in good faith,* has failed to comply with the federal relocation statutes and regulations." (emphasis added).

337 F.Supp. at 233.

The same findings apply to the environmental aspect of the case. *La Raza* involved complicated legal questions; by no means were the duties of the state clear, and the court affirms its earlier findings that the State did not behave in bad faith. Our concern here is with those situations when the defendants' errors and conduct falls short of obdurate behavior.

2. *The common fund situation.*

The second exception is the common fund "situation". In Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), the U.S. Supreme Court held that attorneys' fees can be awarded when the judgment results in a "common fund" for the plaintiffs or for the class. That is to say, when the

Fees and Other Expenses of Litigation as an Element of Damages," 15 Minn. L.Rev. 619 (1931); Stoebuck, "Counsel of Fees Included in Costs: A Logical Development," 38 U.Colo.L.Rev. 202 (1966).

plaintiffs' efforts result in substantial benefits to others, these "free riders"—those who receive significant benefits without paying for them—should compensate the plaintiffs for the benefits the latter has conferred upon them. The Supreme Court has more recently elaborated on the inequity of "free riders" in a litigation context:

"To allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." Mills v. Electric Auto-Lite, 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970).

In other words the "free-riders" situation is an appropriate one for the Court to exercise its equitable powers to award attorneys' fees.

The plaintiffs in *Mills* were certain shareholders in Electric Auto-Lite Company who alleged that a merger had been accomplished through the use of a misleading proxy statement. A group of shareholders brought a derivative action to have the merger set aside and eventually prevailed on the merits. The Supreme Court approved the awarding of attorneys' fees despite the absence of any statutory authorization by utilizing the common-fund approach.

The Court stated that attorneys' fees can be awarded "where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." 396 U.S. at 393, 90 S.Ct. at 626.

*Mills* extended the scope of the common-fund justification for the awarding of fees by holding that no *pecuniary benefit need be demonstrated.* 396 U.S. at 393, 90 S.Ct. 616. In so doing it has become exceedingly difficult to trace the benefits of litigation to their ultimate beneficiaries, so as to apportion the attorneys' fees amongst them.[3] Because of the attendant difficulties in determining the ultimate beneficiaries, the "common fund" mold simply does not fit the present situation. As Judge Merhige stated in Bradley v. School Board of the City of Richmond, Virginia, 53 F.R.D. 28, 35 (E.D.Va.1971), wherein he rejected the common fund theory as a basis for awarding attorneys' fees in a school desegregation case: "School desegregation cases, or any suits against governmental bodies, do not fit this fund model without considerable cutting and trimming."

Consequently, the Court finds it is difficult in this case to support an award of attorneys' fees under the common-fund theory.

3. In this regard see, Bright v. Philadelphia-Baltimore-Washington Stock Exchange, 327 F.Supp. 495, 506 (E.D.Pa. 1971). Plaintiff was a broker who sued the stock exchange and its Board of Directors for alleged violations of the SEC Act of 1934. Plaintiff was denied a place on the Board of Directors of the Stock Exchange, mainly as a result of some questionable procedures. After granting plaintiff injunctive relief on the merits the court awarded attorneys' fees, holding that the entire exchange and its members "benefitted" from plaintiff's efforts. In Brewer v. School Board of the City of Norfolk, Virginia, 456 F.2d 943, (4th Cir. 1972) (en banc), the majority of the circuit found no bad faith by the school board, the usual ground for award-

ing attorneys' fees in school desegregation cases. See, e. g., Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494 (4th Cir. 1963); Bradley v. School Board of City of Richmond, Virginia, 345 F.2d 310 (4th Cir. 1965), remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187. Nevertheless the Fourth Circuit did award attorneys' fees under a common fund theory. The relief granted on the merits included a provision that the school board supply free transportation to students forced to travel outside their neighborhood. The court of appeals held that many of the public school students of Norfolk had therefore received a benefit from the litigation, which the court chose to label a "pecuniary" benefit.

### 3. The "private attorney general" situation.

In finding the required substantial benefit in *Mills*, the Court said: "[T]he stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders." 396 U.S. at 396, 90 S.Ct. at 627. The Court found that this type of "corporate therapeutics" by private stockholders as "providing an important means of enforcement of the proxy statute." 396 U.S. at 396, 90 S.Ct. at 628. *Mills*, then represents both the defensive and offensive use of the Court's equitable powers. Defensive, to prevent unjust enrichment of free riders and offensive, to promote the effective implementation of the Congressional objective of fair and informed corporate suffrage.[4]

Two distinguished federal judges relying partially on *Mills* have put forward a third ground for the awarding of attorneys' fees: the plaintiff as "private attorney-general." See Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971), (opinion of Wisdom, J.); NAACP v. Allen, 340 F. Supp. 703, (M.D.Ala. 1972) (opinion of Johnson, J.). See also Sims v. Amos, 340 F.Supp. 691[5] (M.D.Ala. 1972). The rule briefly stated is that whenever there is nothing in a statutory scheme which might be interpreted as precluding it, a "private attorney-general" should be awarded attorneys' fees when he has effectuated a strong Congressional policy which has benefited a large class of people, and where further the necessity and financial burden of private enforcement are such as to make the award essential.[6]

In a recent case interpreting *Mills*, the Court of Appeals for the District of Columbia in Yablonski v. United Mine Workers, 466 F.2d 424 (D.C.Cir. 1972) reversed a lower court's refusal to award attorney fees in four separate actions. Each of the actions concerned certain alleged violations of various provisions of the Labor Management Reporting and Disclosure Act of 1959. 29 U.S.C. § 401ff. *Yablonski* like *Mills* defies categorization. It is a defensive use of the court's equitable powers as it attempts to spread the costs of securing union democracy over the union membership, but an offensive use in that it provides an effective method of implementing the Congressional policy of advancing union democracy.

Most recently the Fifth Circuit has reaffirmed Judge Wisdom's conclusion that the awarding of attorney fees are proper when the plaintiff seeks to effectuate a strong Congressional policy. Cooper v. Allen, 467 F.2d 836 (5th Cir. decided August 29, 1972).[7] Neither ob-

---

4. Note, "The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co.", 38 U.Chi.L.Rev. 316 (1971).

5. Another federal judge, in a scholarly examination of the complex considerations in school desegregation cases, seems to accept the *premises* of this rule, and indicates a readiness to accept the conclusions as well. See *Bradley, supra* (opinion of Merhige, J.)

6. The fact that attorneys in this action, Public Advocates, Inc., require no fees from their clients or that they receive tax-exempt foundation money is not germain to their status as private attorneys-general. *See* Miller v. Amusement Enterprises, Inc., 426 F.2d 534 (5th Cir. 1970). We cannot presume Congress intended to rely on tax-exempt foundations to fund costs of litigation in order to effectuate its policies, nor that such funding will continue in the future.

7. Judge Rives, speaking for the Court, relies partially on dictum in Newman v. Piggie Park, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Although in that case, a suit under Title II of the Civil Rights Act of 1964, there was a statutory authorization for an award of attorney's fees, the Fifth Circuit found the logic equally applicable when no Congressional statement was present. The Court in *Newman* said:

"If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would

durate behavior nor a common fund was present. But because the trial court failed to articulate the basis of the denial of attorney fees, the Court remanded with instructions that the award should be made pursuant to *Lee, supra,* unless the trial court can set forth specific reasons for the denial.

■ *Mills* does not give the federal courts license to award attorneys' fees in all cases. *Lee,* 444 F.2d at 145. See *e. g.,* Fleishman Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S. Ct. 1404, 18 L.Ed.2d 475 (1967). The matter is addressed to the sound discretion of the trial court and turns on such factors as the strength of the Congressional policy, the number of people benefited by the litigants' efforts, and the necessity and financial burden of private enforcement.

a) The effectuation of strong Congressional policies—Few public policies are accorded the weight and priority of those present in this lawsuit. See the discussion of this point in La Raza Unida v. Volpe, 337 F.Supp. 221, 226–228, (N.D.Cal.1971). The Court could cite numerous judicial and legislative utterances that dramatically portray the strength of these public policies, but the following will serve as examples:

On environmental protection:

That congressional command [23 U.S.C. 138 and Section 4(f) of the DOT Act] should not be taken lightly by the Secretary or this Court. It represents a solemn determination of the highest law-making body of this Nation that the beauty and health-giving facilities of our parks are not to be taken away for public roads without hearings, fact-findings, and policy determinations under the supervision of a Cabinet officer—the Secretary of Transportation. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (opinion Black, J., concurring).

On relocation assistance:

Congress hereby declares that the prompt and equitable relocation and reestablishment of persons, businesses, farmers, and nonprofit organizations displaced as a result of the Federal highway programs and the construction of Federal-aid highways is necessary to insure that a few individuals do not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole. Therefore, Congress determines that relocation payments and advisory assistance should be provided to all persons so displaced in accordance with the provisions of this title.

Section 201 of Title II of the Uniform Relocation Assistance and Land Acquisition Policies Act provides as follows:

The purpose of this [title] is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole.

b) The number of people who have benefited from plaintiffs' efforts—By their litigation efforts plaintiffs have conferred various benefits on numerous

be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees—not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

"It follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fees unless special circumstances would render such an award unjust."
See also, Note, "Allowance of Attorney Fees in Civil Rights Litigation Where the Action is not Based on a Statute Providing For an Award of Attorney Fees", 41 Cinn.L.Rev. 405 (1972).

people in varying degree. The most immediate impact, of course, is on those 5000 people about to be uprooted from their homes and deprived of the parks that would be "replaced" by Route 238. Obviously, these people have benefitted significantly from plaintiffs' efforts. The 200,000 residents of Hayward, Union City, and Fremont have also derived substantial benefits, for they can be assured that the last remaining parks in southern Alameda County will not be destroyed until formal fact-findings and policy determinations have been made.

In addition, the housing and environmental problems from the construction of this highway would have had a very real impact on all the citizens of the Bay Area. The glut on an already crowded housing market, the environmental damage to parks used by Bay Area residents, the increased crowdedness of recreational facilities would all have a substantial effect on residents of the Bay Area.

Moreover, all Californians benefit from this litigation:

1) Because of the decision, the California Highway Department is now most unlikely to build federal-aid highways that might damage the environment and remove people from their houses until the plans for the highway conform with federal statutes and regulations, in other words "state therapeutics"; 2) Californians can be assured that no people in *their* state will suddenly be homeless, and no parks areas will be destroyed, without some attempt to conform to strict standard; 3) California citizens are assured that any environmental damage to their state resulting from the construction of this highway will be minimized; 4) The distribution of people who use recreational facilities will be more even, and the housing

market will not be glutted by the 5000 people suddenly found homeless because of this highway.

Finally, it should be pointed out that environmental protection, housing relocation, and highway construction are nearly everyone's business, and that almost all of society is better off when public policies in these areas have been strengthened.[8]

The fact that so many people have benefited in one way or another from this litigation—residents of Hayward, Union City, and Fremont, residents of the Bay Area, residents of California, the general public—is an additional factor favoring the awarding of fees.

c) The necessity, and financial burden, of private enforcement—Because of the limited resources and potentially conflicting interests within and among governmental entities, effectuation of the public policies towards environmental protection and housing relocation frequently depend on private vigilance and enforcement. In his August, 1971 "Message to Congress" President Nixon stated:

In the final analysis, the foundation on which environment progress rests in our society is a responsible and informed citizenry. My confidence that our Nation will meet its environmental problems in the years ahead is based in large measure on my faith in the continued vigilance of American public opinion and in the continued vitality of citizen efforts to protect and improve the environment.

See also Powelton Civic Home Owners Association v. HUD, 284 F.Supp. 809, 829 (E.D.Pa.1968).

Indeed, this point underlies much of the liberal trend in the "standing" requirements.[9] Responsible representa-

---

8. This point, obviously, is related to the discussion or the effectuation of strong public policies above. Whenever a strong public policy has been effectuated by definition numerous people receive *some* degree of benefit.

9. See Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of N. Y., Inc. v. Scenic Hudson Preserv. Conf., 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540; Office of Communication of United Church of Christ v. FCC, 123

tives of the public should be encouraged to sue, particularly where governmental entities are involved as defendants. As the amicus brief points out, only private citizens can be expected to "guard the guardians."

However, these exhortations towards citizen participation can sound somewhat hollow against the background of the economic realities of vigorous litigation. In many "public interest" cases only injunctive relief is sought, and the average attorney or litigant must hesitate, if not shudder, at the thought of "taking on" an entity such as the California Department of Highways, with no prospect of financial compensation for the efforts and expenses rendered. The expense of litigation in such a case poses a formidable, if not insurmountable, obstacle.[10]

The only public entities that might have brought suit in this case were named as defendants in this action and vigorously opposed plaintiffs' contentions. Only a private party could have been expected to bring this litigation, and yet a private party is least able to bear the tremendous economic burdens. To force the private litigants to bear their own costs here would be tantamount to a penalty, and it seems somewhat inequitable to punish litigants who

have policed those charged with implementing and following Congressional mandates. Hence, the fact that only a private party could be reasonably expected to bring this action is one additional factor supporting the awarding of attorneys' fees in this case.

■ Given, then, the presence of the three factors mentioned above—1) the effectuation of strong public policies; 2) the fact that numerous people received benefits from plaintiffs' litigation success; 3) the fact that only a private party could have been expected to bring this action—this Court believes that it must exercise its equitable powers and award attorneys' fees to the plaintiffs. While we conclude as did the Fifth Circuit in *Lee*, 444 F.2d 147, that this is a sufficient basis upon which to award attorneys' fees, the instant case presents even a more appealing case for the exercise of this Court's equitable power to award fees. Unlike *Lee*, defendants in this motion are not private parties. Since the money will come from the state treasury the awarding of fees in the instant case will also serve the other objective of the *Mills* decision —matching, to the extent that the Court's jurisdiction over the matter makes possible, the costs and the benefits of litigation.[11]

U.S.App.D.C. 328, 359 F.2d 994 (1966); Road Review League, Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967).

10. Absent foundation funding, it is simply not economically rational for any single individual or small group of individuals, to attempt to capture their minute portion of aggregate good by incurring large expense to enforce a widely held right. See M. Olson, Jr., "The Logic of Collective Action, Public Goods and The Theory of Groups" (Harv.Econ.Series #124, 1965).

11. We stop here to consider the question, *sua sponte*, that this Court is without jurisdiction to grant attorney's fees or costs when the real party in interest is the State of California. It is not doubted that this Court has jurisdiction over

this action in the main. La Raza Unida v. Volpe, D.C., 337 F.Supp. 221 (1971). It has been suggested however, that a federal court is without judicial power to award even court costs against state defendant without statutory authorization because of notions of sovereign immunity. Sincock v. Obara, 320 F.Supp. 1098 (D. Del.1970). Drawing a distinction between actions for injunctions, *see e. g.*, Georgia R. R. & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952), and an action which results in a monetary judgment against the state or any official in his representative capacity, the Court in Sincock declined to exercise its equitable powers to award either costs or attorneys' fees, for want of jurisdiction.

Other courts seem to hold that the power to tax costs against the state is

The defendants argue that Congress, by its failure to provide for the awarding of fees in the statutes involved in this case, indicated an intent that fees should not be awarded. Congressional silence, however, is not a bar to the awarding of fees. See the discussion in *Mills*, 396 U.S. at 390, 90 S.Ct. 616. The Court possesses within its equity jurisdiction the power to award fees. See, *e. g., Mills*; *Sprague*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). And the equities of this particular case compel the awarding of attorneys' fees. Plaintiffs' motion is granted.

We cannot emphasize enough that in granting this motion, the purpose is not to saddle the losing party with the financial burden in order to punish him, rather we shift the financial burden in order to effectuate a strong Congressional policy. *Accord, Mills*, 396 U.S. at 396–397, 90 S.Ct. 616.

Plaintiffs also seek reimbursement for their expert witness fees. The affidavits of the expert witnesses were quite helpful to the Court, and were a crucial part of the plaintiffs' presentation. For the reasons stated above in granting attorneys' fees, plaintiffs' motion to award expert witness fees is also granted.

necessarily incident to jurisdiction; that where jurisdiction over the action in the main is proper no specific statute is required to overcome the state's sovereign immunity in federal court. *See* State of Utah v. United States, 304 F.2d 23 (10th Cir. 1962); *cf.* Fairmont Creamery Co. v. Minnesota, 275 U.S. 70, 48 S.Ct. 97, 72 L.Ed. 168 (1927).

In Sims v. Amos, the court said:

*Individuals* who, as officers of a state, are clothed with some duty with regard to a law of the state which contravenes the Constitution of the United States, may be restrained by injunction, and in such a case the state has no power to impart to its officers any immunity from such injunction or from its consequences, including the court costs incident thereto.

340 F.Supp. 691 (M.D.Ala. decided March 17, 1972) (at n. 8) (emphasis added).

That federal courts have awarded attorney's fees to successful litigants against state officers without statutory authority cannot be denied. *See, e. g.,* Sims v. Amos, *supra,* (Governor of Alabama and Secretary of State); Wyatt v. Stickney, 344 F.Supp. 373 (M.D.Ala. decided April 13, 1972), (State regulatory agency). *See also,* Cooper v. Allen, *supra* (Mayor of Atlanta, Georgia); Brewer v. School Board of Norwalk, *supra* (school board); Hammond v. Housing Authority & Urban Renewal Agency of Lane County, 328 F.Supp. 586 (D.Or.1971), (municipal housing authority). But of course, the eleventh amendment has been read not to apply to local bodies. Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890).

Since we conclude as the court did in *Sims* that the state may no more immunize an individual from costs incident to an injunction than it may insulate him from the injunction itself, we find that sovereign immunity does not bar an award of attorney's fees against Chief Engineer Legarra. The State of California has provided that monetary claims or judgments against state officers, in such a situation, are reimbursable by the public entity which employed the individual. West's Cal.Code Gov't § 825 et seq. As such the questions of sovereign immunity with respect to the other defendants have become largely academic.