**Peters Township School District v. Flynn**

*Reed B. Day,* for plaintiff.
*Gustave Diamond,* for defendants.

SWEET, *P. J.*, October 29, 1976 — This case raises the question whether a school district is entitled to recover counsel fees if it successfully brings a mandamus proceeding against the county for failure to comply with assessment law. We were able to settle the principal questions in the case at conference, but the pesky problem of whether the School District of Peters or the Commissioners of Washington County should pay fees had to be separated from the rest of of the matter and referred to argument court.

In Pennsylvania it would seem that there are three good grounds for awarding attorney's fees to the verdict winner at the expense of the verdict loser. These are discussed at some length in the opinion of the Commonwealth Court in Feist, et al. v. Luzerne County Board of Assessment Appeals, at 22 Pa. Commonwealth Ct. 181, 347 A.2d 772 (1975), a case very similar to ours in its factual background. There are three theories on which awards of this nature have been made. The first is the "common fund" exception, where as a result of the litigation a fund is created to the benefit of the class of plaintiffs involved. The second theory, also an exception to the general rule, is the "obdurate behavior" exception. " 'This rule has its application in instances where the defendants have acted in bad faith. It can be seen to apply in instances where a party defendant with great resources, but not much law, on his side determines to protract ligitation [sic] merely on the theory that he can wear his opponent to complete financial exhaustion. The key factor, of course, must be the proven bad faith of the offending party.' "

The third theory under which fees have been awarded is the "private attorney general excep-

tion." The Commonwealth Court in Feist adopted the opinion of Judge Bigelow of the Luzerne Common Pleas who observed that: " '. . . in most cases where awards of this nature have been allowed, the class of litigants involved have been relatively indigent groups such as low-rent housing residents . . .' "

One court has succinctly described the private attorney general rationale as follows: "A 'private attorney general' should be awarded attorneys' fees when he has effectuated a strong Congressional policy which has benefited a large class of people, and where further the necessity and financial burden of private enforcement are such as to make the award essential." La Raza Unida v. Volpe, 57 F.R.D. 94 (N. D. Cal. 1972). Feist, the latest case from our appellate court, offers no comfort to the plaintiff here.

Our Supreme Court stated the general rule in Shapiro v. Magaziner, 418 Pa. 278, 210 A.2d 890 (1965). The unanimous opinion of the Supreme Court said in part: " ' "Over and over again we have decided there can be no recovery for counsel fees from the adverse party to a cause, in the absence of express statutory allowance of the same" . . . 'or some other established exception . . .' " This had been the standard rule in this case at least since Hempstead v. Meadville Theological School, 286 Pa. 493, 134 Atl. 103 (1926). This decision was reiterated in Chatham Communications, Inc. v. General Press Corporation, 463 Pa. 292, 344 A.2d 837 (1975).

Another indication of how strong this policy had been in Pennsylvania is found in Ferruzza v. Pittsburgh, 394 Pa. 70, 145 A. 2d 706 (1958), where the jury, which had first returned verdict for

plaintiff in amount of "$15,000 plus medical expense, hospital expense. . .[and] all Court costs and attorney's fee. . ." minutes after being told that their first verdict was improper, returned a verdict of $25,000. The Supreme Court held this ". . . was a patent method of adding attorney's fees and Court costs by indirection," and was so obviously capricious as to require granting of a new trial. The Superior Court has also said about the same thing we note in Flood Appeal, 178 Pa. Superior Ct. 75, 113 A.2d 349 (1955).

The New York Times for October 10, 1976, page 31, carried a story headlined "High Court Accused of Double Standard. Law Deans Say Justices Grant Access to Bench to Groups They Favor But Deny it to Others." the group making the charges was the board of governors of the Society of American Law Teachers, a three-year old organization that seeks to represent the interests of law teachers and to speak out on public issues related to law. One of their items of censure was: "Rulings that limit the power of Federal courts to 'fashion appropriate remedies' for violations, such as the decision that limited the ability of courts to award attorney's fees in public interest lawsuits brought to vindicate the public's legal rights."

There has been a substantial amount of litigation, and equally impressive volume of professorial gloss on the case law.[1]

---

[1] Those who are interested may turn to Private Attorney General Fees Emerge From the Wilderness, 43 Fordham L. Rev. 258 (1974); Ehrenzweig, Reimbursement of Counsel Fees and the Great Society, 54 Calif. L. Rev. 792 (1966); McCormick, Counsel Fees and Other Expenses of Litigation as an Element of Damages, 15 Minn. L. Rev. 619 (1931); Stoebuck, Counsel Fees Included in Costs: A Logical Devel-

Being unaware of the Times story at argument court I suggested there might be a fourth exception developing, a sort of pro bono publico rule. Mr. Justice Marshall, dissenting in Alyeska Pipeline

---

opment, 38 U. Colo. L. Rev. 202 (1966); Court Awarded Attorney's Fees and Equal Access to the Courts, 122 U. Pa. L. Rev. 636 (1974); Attorney's Fees: Where Shall the Ultimate Burden Lie?, 20 Vand. L. Rev. 1216 (1967); Use of Taxable Costs to Regulate the Conduct of Litigants, 53 Colum.L. Rev. 78 (1953); Dawson, Lawyers and Involuntary Clients: Attorney's Fees From Funds, 87 Harv. L. Rev. 1597 (1974); The Allocation of Attorney Fees After Mills v. Electric Auto-Lite Co., 38 U. Chi. L. Rev. 316 (1971); Dewberry, Attorney's Fees in Public Interest Litigation: A Return to the Wilderness of the American Rule, 28 U. Fla. L. Rev. 240 (1975). The reasons for the American Rule, a rejection of the English model which taxed fees against the losing litigant are said to include, "Among the explanations for the rejection: the 17th and early 18th century perception of lawyers as disreputable characters who should not be encouraged by fee awards; the concept of law as a body of rules that could be applied by the intelligent layman, making a lawyer a luxury; the rugged individualism fostered by the frontier experience; and, particularly following the Revolution, a pervasive reaction against anything British. . . . Some of the common arguments for the Rule are: a person should not have to risk an additional penalty for prosecuting or defending a lawsuit; such a potential penalty would deter poorer litigants with meritorious cases; and too much judicial effort would be expended in litigating the difficult issue of reasonable attorneys' fees. Also, fee-shifting might lead to abuses such as hiring more counsel than necessary, or paying them excessive fees. . . . Some criticisms of the Rule: (1) it results in the prevailing party being made less than whole since he must pay his attorney out of his recovery; (2) meritorious litigation is sometimes discouraged in cases where the fee could exceed the total recovery (particularly in public interest litigation, where monetary damages are not always available); and (3) the financially secure litigant enjoys an unconscionable advantage over his poorer adversary." Dewberry, ibid.

Service Co. v. Wilderness Society et al., 421 U.S. 240, 95 S. Ct. 1612 (1975), at 274 says this:

"In Sprague v. Ticonic National Bank, supra, the lower courts had denied a request for attorney's fees from the proceeds of certain bond sales, . . . This Court reversed, holding that the allowance of attorney's fees and costs beyond those included in the ordinary taxable costs recognized by statute was within the traditional equity jurisdiction of the federal courts."

Mr. Justice Marshall went on to say this:

" 'Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional [statutory] taxable costs is part of the original authority of the chancellor to do equity in a particular situation'. In more recent cases, we have reiterated the same theme: while as a general rule attorney's fees are not to be awarded to the successful litigant, the courts as well as the Legislature may create exceptions to that rule. . . . Under the judge-made exceptions, attorneys' fees have been assessed, without statutory authorization, for willful violation of a court order . . . for bad faith or oppressive litigation practices, . . . and where the successful litigants have created a common fund for recovery or extended a substantial benefit to a class."

Mr. Justice Marshall goes on to say: "The cases plainly established an independent basis for equity courts to grant attorneys' fees under several rather generous rubics." He acknowledges:

"I am at a loss to understand how it can also say that this independent judicial power succumbs to Procrustean statutory restrictions — indeed, to

statutory silence — as soon as the far from bright line between common benefit and public benefit is crossed. I can only conclude that the Court is willing to tolerate the 'equitable' exceptions to its analysis, not because they can be squared with it, but because they are by now too well established to be casually dispensed with."

All of the foregoing may make the existence of a pro bono publico exception to the general rule an intelligent and valid bit of surplusage, however, it does not make such an exception the law.

The majority holding of the Supreme Court of the United States in Alyeska Pipeline squarely comes down in favor of the defendant here.

In a five to two decision the Supreme Court of the United States held as follows:

"Under the 'American Rule' that attorney's fees are not ordinarily recoverable by the prevailing litigant in federal litigation in the absence of statutory authorization, respondents, which had instituted litigation to prevent issuance of Government permits required for construction of the trans-Alaska oil pipeline, cannot recover attorney's fees from petitioner based on the 'private attorney general' approach erroneously approved by the Court of Appeals, since only Congress, not the courts, can authorize such an exception to the American Rule."[2] The same footnote refers us to

---

[2] f.f.n. 18 at page 247 says of the history of the thing: " 'As early as 1278, the courts of England were authorized to award counsel fees to successful plaintiffs in litigation. Similarly, since 1607 English courts have been empowered to award counsel fees to defendants in all actions where such awards might be made to plaintiffs. Rules governing adminis-

an illuminating article by Goodhart, Costs, 38 Yale L.J. 849 (1929).

"In 1796, this Court appears to have ruled that the Judiciary itself would not create a general rule, independent of any statute, allowing awards of attorneys' fees in federal courts. In Arcambel v. Wiseman, 3 Dall. 306 [1796] the inclusion of attorneys' fees as damages was overturned on the ground that '[t]he general practice of the United States is in oposition [sic] to it; and even if that practice were not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified, by statute.' This Court has consistently adhered to that early holding."

An interesting article in the University of Florida Law Review says:

"Ultimately, the Alyeska decision rests upon two policy considerations important to the present Court majority. The first is a refusal of the role of a superlegislature — a refusal to assume the initiative in national policy when Congress has not acted. The second is a desire to avoid facilitating access to the overburdened federal courts at a time of increased emphasis on private litigation in the public interest.

"The private attorney general doctrine repre-

---

tration of these and related provisions have developed over the years. It is now customary in England, after litigation of substantive claims has terminated, to conduct separate hearings before special 'taxing Masters' in order to determine the appropriateness and the size of an award of counsel fees. To prevent the ancillary proceedings from becoming unduly protracted and burdensome, fees which may be included in an award are usually prescribed, even including the amounts that may be recovered for letters drafted on behalf of a client.' "

sented a strong challenge to the long-standing American Rule against fee shifting. The doctrine, however, involved difficult policy considerations. It was necessary to determine: the importance of individual statutory rights to society; whether private defendants should bear the costs of implementing public policy; and whether the resources of the judiciary are adequate to handle the potential increase in litigation. As these policy decisions may well be beyond the scope of the courts, the [Alyeska] decision represents a sound recognition of judicial limitations.

"Because the bad faith, common fund, and common benefit exceptions are usually unavailable, the decision seems a definite setback for plaintiffs in public interest litigation. Dewberry, supra [p. 248.]"

The various opinions in Alyeska Pipeline Service are so complete and exhaustive of the subject that it would be redundant for us to say more.[3] Accordingly, plaintiff's prayer for the award of counsel fees is denied. We take this action reluctantly because the settlement which was achieved between the parties was very largely a consent verdict, the county granting to the Township of Peters School

---

[3] Since the text of this opinion was written, the President has signed S.2278, Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C.A. 1988, October 19, 1976, 90 Stat. 2641, which provides that the prevailing party, other than the government, may be awarded a reasonable attorney's fee in suits to enforce federal civil rights statutes. The award is discretionary with the court. The Criminal Law Reporter of the Bureau of National Affairs, Inc., for October 27, 1976 attributes this statute to the Alyeska case, and says: "This Act was introduced to fill the void recognized in Alyeska . . ." Significantly our legislature has not so acted.

Board almost exactly what it asked for in its suit. During 1974 and 1975 the county, although perhaps not an obdurate defendant,dragged its feet on reassessment. In 1976, a somewhat better attitude manifested itself and the commissioners entered into a consent decree. It would be an unfortunate obfuscation of language for us to find a defendant which entered into a consent decree to be an obdurate defendant. Surely one who does not insist on standing trial is not protracting litigation.

While the allowance of a period until December 31, 1979, may be a little plenteous for the reassessment of the county we now at least have a timetable and some visible motion in that direction. We realize there is no way to reassess this county overnight. The advent of the computer may even have delayed the paper work a little since the preparation and feeding of material into the computer takes so long.

It would be straining the language to say that the Peters suit created a common fund, for obviously no fund or money exists, except the bond money apparently set aside before the Peters suit was filed. With the Alyeska case striking down the notion which had been developing during this decade toward a pro bono publico exception to the general rule, we can find no authority on which to authorize the fee. It will be small reimbursement to Peters Township we know to say that their action was in the best sense of the word, pro bono publico.

## ORDER

In accordance with the foregoing discussion, the motion for counsel fees is refused and exception noted.