VILLAGE OF LOS RANCHOS DE AL-
BUQUERQUE; and Rio Grande Valley
Preservation Society, Plaintiffs–Appel-
lants,

and

Elbert King; Joan McGinnis; Velma
Whipple; Thomas Montoya; Priscilla
Montoya; John Trotter; Kit Sargent,
Plaintiffs,

v.

R.H. BARNHART, Administrator of the
Federal Highway Administration; Eliz-
abeth Dole, Secretary of the Depart-
ment of Transportation; Peter A. Lom-
bard, Environmental Protection Spe-
cialist for the Federal Highway Admin-
istration; Daniel Dake, Director, Office
of Planning and Programming Devel-
opment of the Federal Highway Admin-
istration; Dewey Lonsberry, Federal
Highway Division, Administrator, De-
fendants–Appellees,

and

The City of Albuquerque; and The
County of Bernalillo,
Defendants–Intervenors–Appellees.

No. 87–2657.

United States Court of Appeals,
Tenth Circuit.

July 2, 1990.

**1478**

Alice G. Hector of Hector & Associates, P.A., Albuquerque, N.M., for plaintiffs-appellants.

Vicki L. Plaut (Roger J. Marzula, Acting Asst. Atty. Gen., William L. Lutz, U.S. Atty., Herbert A. Becker, Asst. U.S. Atty., Albuquerque, N.M., Robert L. Klarquist, Atty., Dept. of Justice, Land and Natural Resources Div., and Jean G. Rogers, of Counsel, Federal Highway Admin., with her on the brief), for defendants-appellees.

James H. Foley, City Atty., and Edward R. Pearson, Asst. City Atty., for City of Albuquerque, and Joe C. Diaz, County Atty., and MaryAnn Lunderman, Deputy County Atty., for County of Bernalillo, on the brief, for defendants-intervenors-appellees.

Before LOGAN, MOORE and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Plaintiffs (The Village of Los Ranchos de Albuquerque, the Rio Grande Valley Preservation Society, and certain named residents in Albuquerque's North Valley) appeal from a decision of the United States District Court for the District of New Mexico granting summary judgment in favor of defendants (certain officials in the Federal Highway Administration ("FHWA"), the City of Albuquerque, and the County of Bernalillo). We affirm.

## FACTS

The district court summarized the relevant facts as follows:

The North Valley river crossings project is a proposal for construction of two bridges across the Rio Grande River, one at Paseo del Norte just south of an existing crossing at Corrales Road, and another further south at Montano Road. Construction on the Paseo del Norte has begun as of this writing, while the Montano Bridge is still in the planning stage. Both bridges involve substantial right-of-way acquisitions within the Village [of Los Ranchos de Albuquerque], a rural community northwest of Albuquerque. Further, the project involves widening of Village roads and addition of new roads to handle the increased bridge traffic, with resulting effects of increased noise, etc., on neighboring Village landowners. The bridge at Paseo del Norte will be a four-lane crossing with an option for later expansion to six lanes, while the Montano crossing is proposed to be two lanes.

While few residential homeowners would react favorably to the prospect of having a major arterial traffic route built practically in their backyards, the citizens of the Village are particularly concerned about the impact of the new bridges on the rural quality of their neighborhood, various sites of historical interest in that area, and the effects of the project on the river bosque wetlands. The Village has thus brought suit under various federal environmental protection statutes, arguing that, in approving the bridge projects, the federal government is taking action which will adversely affect the environment, without adequate study and planning as required by law.

The central issue in this motion [for summary judgment] is whether or not the federal government's involvement in the river crossings project is sufficiently major to trigger the applicable statutes. Therefore, the extent of that involvement must here be set forth in some detail.

Federal involvement in the river crossings project was initiated by a January 1979 decision of the Urban Transportation Planning Policy Board ("UTPPB") of the Middle Rio Grande Council of Governments to seek a location-environmental study of the project. This request was presented to the Federal Highway Administration ("FHWA"), where, on February 5, 1979, the Division office in Santa Fe, New Mexico, authorized preliminary engineering work in preparation of the environmental study for the river crossings project. The authorization form for the project, Defendants' Exhibit 8A, estimated the cost of the location-environmental study at $75,000.00, and authorized federal financial assistance for part of these costs, in the amount of $58,972.50.

In addition to provision of funding, the federal government took an active role in the preparation of the EIS. Without going into exhaustive detail as the process is set forth in Defendants' Answers to Interrogatories, submitted as Plaintiff's Exhibit 1, it is safe to say that the actual preparation of the EIS required fairly exhaustive federal assistance from approving agencies and individual FHWA personnel. The process is lengthy and, as the actual sufficiency of the EIS itself is not at this time before the Court, the Court will not here reiterate those procedures. A Final Environmental Impact Statement ("FEIS") for the river crossings project was approved by Peter Lombard, Director of the Office of Planning and Program Development in the Region 6 Office of the FHWA, on September 16, 1983.

After approval of the FEIS, the City of Albuquerque programmed $4.2 million of 1983 general obligation bond money for the Montano crossing, and an additional $6.1 million was appropriated for the project from the 1985 bond election.

According to the affidavit/testimony of Joseph Martin, Director of New Mexico Department of Transportation, Harry E. Kinney, former Mayor of Albuquerque, and Kenneth E. Bower, Jr., Director of Technical Support for the New Mexico State Highway Department, federal funding has not been and will not be requested for any part of the Montano or the Paseo del Norte river crossings. Thus, as of the date of FEIS approval by the FHWA, federal involvement in the river crossing came to an end, as far as any financial assistance was concerned.

(Memorandum Opinion and Order at 3–5, June 9, 1987) (footnote omitted).

Plaintiffs sought a declaration that the federal environmental laws were violated and an injunction against all further federal participation in the project. After considering the evidence submitted by both sides, the district court granted summary judgment in favor of the federal defendants on the ground that the FHWA's participation in the bridge projects was not sufficient to trigger the federal laws. The district court subsequently granted summary judgment in favor of the local defendants "on the same grounds as stated by the Court for dismissal of Plaintiff's complaint against the Federal Defendants." (Order at 1, October 7, 1989.) Plaintiffs appeal.

## ISSUES

Plaintiffs raise four issues on appeal: (1) whether construction of the Montano bridge is a "major federal action" subject to the requirements of the National Environmental Policy Act; (2) if construction of the bridge is not a major federal action, whether the bridge project was properly segmented from the federally funded I–25/Los Angeles project, which is a major federal action; (3) whether construction of the bridge requires compliance with section 106 of the National Historic Preservation Act; and (4) whether construction of the bridge requires compliance with section 4(f)

of the Department of Transportation Act or Executive Order 11990.

## NATIONAL ENVIRONMENTAL POLICY ACT

Plaintiffs argue that the federal defendants' improper approval of the EIS for the Montano bridge violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq.* NEPA provides in pertinent part:

> The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
>
> . . . .
>
> (C) include in every recommendation or report on proposals for legislation and other *major Federal actions* significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Section 4332 (emphasis added).

The requirements of NEPA apply only when the federal government's involvement in a project is sufficient to constitute "major federal action." Plaintiffs contend that the bridge project is a major federal action because of (1) the local defendants' eligibility for federal funding or (2) the FHWA's participation in and approval of the EIS. We disagree.

### 1. *Eligibility for Federal Funding*

■ Federal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA. In *La Raza Unida v. Volpe,* 337 F.Supp. 221 (N.D.Cal.1971), *cert. denied* 409 U.S. 890, 93 S.Ct. 105, 34 L.Ed.2d 147 (1972) (prematurely filed), *supplemented by* 57 F.R.D. 94 (attorney's fees), *aff'd* 488 F.2d 559 (9th Cir.1973), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974), the Federal District Court for the Northern District of California addressed the issue of whether "the federal regulations and statutes apply to a highway project upon location approval, construction approval, or some intermediate point when federal participation is assured[.]" *Id.* at 226. The court analyzed the problem by dividing highways into three categories: (1) "highways for which federal funds have been approved or are immediately sought"; (2) "state highways constructed without federal funds, and for which federal participation has never been sought"; and (3) "those projects that may eventually receive federal funds." *Id.* at 226–27. The court said that there is no question that highways in the first category are major federal actions, and highways in the second category clearly are not; the troublesome category is the third. The court concluded that highways in the third category are major federal actions and require compliance with federal rules because "[a]ny project that seeks even the possible protection and assistance of the federal government must fall within the statutes and regulations." *Id.* at 227.[1]

---

**1.** In the case before us, the district court distinguished *La Raza* by noting that in *La Raza* the local government still had the *option* to receive federal funds, whereas here, the district court concluded that the local defendants have foreclosed that possibility and thus fall into *La Raza*'s second category. We agree with the

district court that an official foreclosure of all possibility of federal assistance will undoubtedly work to exempt a federal agency from NEPA requirements. However, here we find no concrete evidence that the local government was ever officially precluded from seeking federal assistance even though it expressed its intention

The United States District Court for the District of Connecticut recognized the flaws in the approach taken in *La Raza,* and, instead of requiring all highways in *La Raza*'s third category (state highways that may eventually receive federal funds) to submit to federal requirements, rejected *La Raza* and held that no highways in that category should be subject to federal requirements:

> Though recognizing the force of the argument developed in *La Raza Unida,* this Court concludes that while Congress no doubt has power to require NEPA compliance in such circumstances, the existing legislation simply does not do so.
>
>  . . . .
>
> The contentions in [*La Raza*] are all sound, but with deference I do not understand how they establish that such an option [to apply for federal funding] on the part of a state constitutes the highway a "Federal action" within the meaning of NEPA. Solicitude for the environment cannot substitute for legislation. Congress has not applied NEPA to all highways that the states are *eligible* to fund with federal dollars.
>
>  . . . .
>
> The State's option to use federal dollars, though open virtually until the concrete is poured, is nonetheless an option, and the State's choice should not be restricted simply because one alternative of the option (using state dollars) might result in less adequate assessment of environmental considerations. If the highway is not a federal action, then a state's decision to avoid federal involvement cannot have the paradoxical effect of establishing federal involvement.

*Citizens for Balanced Environ. & Transp., Inc. v. Volpe,* 376 F.Supp. 806, 812–13 (D.Conn.), *aff'd,* 503 F.2d 601 (2nd Cir.1974), *cert. denied,* 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975) (emphasis in original).

We are persuaded by the analysis of *Citizens* and adopt its conclusions. Therefore, because the State of New Mexico, the City of Albuquerque, and the County of Bernalillo here (hereinafter collectively referred to as "the state") are only eligible for federal assistance, that eligibility in itself is not sufficient to establish a major federal action requiring the FHWA to comply with the requirements of NEPA.

2. *Approval of the EIS*

■ Plaintiffs also argue that FHWA's assistance in and approval of the EIS is sufficient to make the bridge project a major federal action.[2] The district court rejected this argument on the following grounds:

> Clearly, the state in the instant case did not initially need any type of *federal* approval, assuming that they chose not to seek federal money, in order to proceed with the river crossings project. The fact that the state did voluntarily request a federal EIS, though they were not legally bound to do so, should not, without more, constrain the state to make the entire project federal. Unless the state is actually receiving or is planning to receive federal funding for a project, mere preparation and approval of an EIS is not "major federal action."

(Memorandum Opinion and Order at 9, June 9, 1987.) We agree with the district court and would only add that an EIS is what is required once a project is deemed to be a major federal action. *See* 42 U.S.C. § 4332(C)(i). It would be anomalous indeed

---

not to seek federal funds. Thus, we analyze this case on the premise that the local government still had the possibility of receiving federal funds.

**2.** In their reply brief, plaintiffs state that "an EIS itself is not a 'major federal action,'" and that they "are not making such an absurd claim." *See* Appellant's Reply Brief at 2. Rather, plaintiffs argue that "it is the funding and preparation assistance by the FHWA of the location study that preceded the EIS that triggers

NEPA." *Id.* However, at oral argument plaintiffs argued that the location study is a component of the EIS. We cannot accept plaintiffs' implicit argument that the lesser (the location study) can impose higher standards (such as compliance with NEPA) than the greater (preparation of the EIS). Therefore, we construe plaintiffs' argument as stating that the EIS, which in this case includes the location study, is the major federal action.

to say that in a case such as this, where there is no showing that the local defendants were involved in a sham transaction to evade federal environmental requirements, that the preparation and approval of an EIS is a major federal action for which an EIS must be prepared and approved.

Plaintiffs also point to the fact that the federal government contributed nearly $59,000 of the $75,000 cost of the location study. Although $59,000 is indeed a large portion of that cost, it was incurred in connection with the preparation of the EIS and it is minuscule in comparison with the cost of the total bridge project.[3] *Cf. Citizens for Balanced Environ. & Transp., Inc. v. Volpe,* 376 F.Supp. 806, 810 (D.Conn.) ("The only other federal funding indicated is a sum less than $50,000 of federal highway planning and research funds that were used in connection with the planning of the proposed road. The size of this expenditure and the totally preliminary purposes of the funds are too insignificant to render the proposed multimillion dollar highway a federal action.") (footnote omitted), *aff'd,* 503 F.2d 601 (2nd Cir.1974), *cert. denied,* 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975).

■ For the foregoing reasons, we agree with the district court "that federal involvement with the bridge project[ ] was minimal, and, as a matter of law, did not rise to the level of 'major federal action' so as to bring the project within the purview of federal environmental laws." Memorandum Opinion and Order at 2, (June 9, 1987).

We draw guidance from *Sierra Club v. Hodel,* 848 F.2d 1068 (10th Cir.1988), as to the meaning of the phrase "major federal action." In that case we analyzed whether and to what extent the Bureau of Land Management (the "BLM") could exercise control over a county's major road improvement project, and then we addressed whether such input or control by the BLM constituted "major federal action." First, we observed that the Council on Environmental Quality's regulations have defined

major federal action to encompass not only actions by the federal government but also nonfederal actions " 'with effects that may be major and which are potentially subject to Federal control and responsibility. 40 C.F.R. § 1508.18.' " *Id.* at 1089. However, we went on to state that:

> "[T]he distinguishing feature of 'federal' involvement is the ability to influence or control the outcome in material respects. The EIS process is supposed to inform the decision-maker. This presupposes he has judgment to exercise."
>
> . . . .
>
> The touchstone of major federal action, in the context of the case before us, is an agency's authority to influence significant nonfederal activity. This influence must be more than the power to give nonbinding advice to the nonfederal actor. . . . Rather, the federal agency must possess actual power to control the nonfederal activity.

*Id.* at 1089 (quoting W. Rodgers, *Environmental Law* 763 (1977) (citation omitted).

Given the decision of the state to proceed with the bridge project without federal assistance beyond the initial location study and EIS preparation, we conclude that there is no evidence that the federal government had the actual power to control this project. At most, it gave advice as to the location of the bridge. Thus, we do not here have any "major federal action."

## SEGMENTATION

■ Plaintiffs argue that even if the participation in, and approval of, the EIS alone is not enough to make the project federal, the bridge project was improperly "segmented" from the I–25/Los Angeles Interchange project, which is a major federal project subject to the requirements of NEPA. The district court rejected that argument, holding that "the evidence is undisputed that the projects are, at best, only peripherally related, and have not been improperly segmented from one an-

---

**3.** The City of Albuquerque floated $10.3 million in bonds in 1983 and 1984 to finance the bridge project.

other." (Memorandum Opinion and Order at 10, June 9, 1987.) We agree.

"As a general rule under NEPA, segmentation of highway projects is improper for purposes of preparing environmental impact statements." *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 439 (5th Cir.1981). However, a local project closely related physically to a federal project may be deemed independent for NEPA purposes after consideration of whether the proposed segment:

(1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects. *Id.*[4]

Plaintiffs argue on appeal that the district court erred in determining that they had failed to present any issues of material fact.[5] Specifically, they argue that an affidavit submitted by one of their transportation consultants demonstrates that the eastern terminus of the bridge project, Edith Avenue, is not logical:

8. The ... Wilson & Company [traffic] report addresses a Montano Corridor with termini at Coors Road and Edith Boulevard. Figure 2 in that report indicates that 30% of the estimated year 2005 bridge traffic (or 5,070 vehicles per day) *will use the section of Montano between Edith Boulevard and I–25.*

9. Since nearly a third of all bridge traffic will use Montano Bridge *east* of Edith Boulevard, this strongly suggests *that the logical eastern terminus for consideration of bridge traffic impacts and related improvements would be I–25,* which is the next major intersecting, regional route east of Edith Boulevard.

10. An I–25 terminus for Montano Corridor improvements also has basis according to the Environmental Assessment (EA) for the I–25 Frontage Road improvements. Section "O" of the EA notes that among the assumptions behind the traffic forecasts used in the I–25 Frontage Road analysis was the following:

... a new Montano corridor bridge and roadway (two-lane limited access facility) from Coors Road to Interstate 25 via Montano Road/Montgomery Boulevard.

Affidavit of Harvey R. Joyner, Doc. 111 at ¶ 8–10) (emphasis added).

We do not read that evidence to say that Edith Boulevard is *not* a logical terminus. Rather, the affidavit, at most, merely asserts that the I–25 terminus would be *more* logical. That a terminus is the most logical is not mandated by the segmentation analysis—that analysis requires only that a terminus be "logical." Because plaintiffs point us to no evidence in the record indicating the Edith Boulevard is not a logical terminus, we agree with the district court that there is no question of material fact on that issue.

Even if a local project terminates at a point of juncture with a federally funded project, that would not preclude segmentation. "Congress has not purported to apply NEPA requirements to [e]very highway that connects with a federally-funded highway, and the fact that the connection here involves a three-mile overlap makes no difference." *Citizens for Balanced Environ. & Transp., Inc. v. Volpe,* 376 F.Supp. 806, 810 (D.Conn.), *aff'd,* 503 F.2d 601 (2nd Cir. 1974), *cert. denied,* 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975). Because all

---

**4.** The district court considered only the first three factors enumerated in *Piedmont Heights.* (Memorandum Opinion and Order at 10–11, June 9, 1987, citing 23 C.F.R. § 771.111(f); *Daly v. Volpe,* 514 F.2d 1106 (9th Cir.1975)). The appellants, however, do not argue that the district court failed to consider all relevant factors. Instead, they argue the district court erroneously found no issue of material fact with regards to the factors it did consider.

**5.** The district court's findings are as follow:

The Court finds that there is no material issue of fact as to whether such segmentation was proper, as [plaintiffs have] presented no evidence to the Court that the [I–25] project is in any way related to the Montano bridge crossing, other than the inevitable relationship caused by the fact that some of the new frontage road traffic will undoubtedly use that route as a means of access to Montano Road, and hence to the new bridge crossing.

Memorandum Opinion and Order at 11, (June 9, 1987).

local projects must start and end somewhere, under plaintiffs' theory the entire highway network across the country could be considered one project. Such an implication is obviously indefensible.

Because the criteria advanced in *Piedmont Heights* are satisfied here, and because plaintiffs have not demonstrated any issues of material fact or raised any other arguments that would demonstrate that the district court erroneously granted summary judgment in favor of defendants, we affirm the district court's holding that defendants did not improperly segment the bridge project from the I-25 project.

### NATIONAL HISTORIC PRESERVATION ACT

■ Plaintiffs argue that the construction of the bridge requires compliance with section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.* The NHPA provides in pertinent part:

> The head of any Federal agency having direct or indirect jurisdiction over *a proposed Federal or federally assisted undertaking* in any State ... shall, prior to the approval of *expenditure of any Federal funds* on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure or object that is included in the National Register.

16 U.S.C. § 470f (emphasis added).

As we held above, the participation in and approval of the EIS in this case did not render the bridge project federal in nature. Moreover, the bridge project is not under the "direct or indirect jurisdiction" of the FHWA. Therefore, we cannot say that it

is "a proposed Federal or federally assisted undertaking" requiring the FHWA's compliance with the requirements of the NHPA.[6] *See Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C.Cir.1989).

### DEPARTMENT OF TRANSPORTATION ACT and EXECUTIVE ORDER 11990

Plaintiffs argue that the construction of the bridge requires compliance with section 4(f) of the Department of Transportation Act ("DTA"), 49 U.S.C. § 303 and 23 U.S.C. § 138, and Executive Order 11990. We disagree.

#### 1. *Section 4(f)*

■ Section 4(f) provides that it is the national policy "that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." To that end, Section 4(f) permits the Secretary of Transportation to approve a transportation project only if

> (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife or waterfowl refuge, or historic site resulting from such use.

49 U.S.C. § 303; *see* 23 U.S.C. § 138. Plaintiffs argue that the Secretary's actions in this case constituted "approval" of the project such that compliance with Section 4(f)'s requirements is necessary.

We hold that, like the NEPA and the NHPA, Section 4(f) is only applicable to federal projects. *See Historic Preserva-*

---

**6.** Plaintiffs refer to the 1986 version of the regulation promulgated to implement the NHPA, which defines "undertaking" as

> any Federal, federally assisted or federally licensed action, activity, or program or *the approval*, sanction, assistance, or support of any *Non-Federal action*, activity or program. Undertakings include new and continuing projects and program activities ... that are
> ....
> (3) carried out pursuant to a Federal lease, permit, license, certificate, *approval*, or other form of entitlement or permission.

36 C.F.R. § 800.2(c) (1986) (emphasis added in Appellants' Brief). Assuming, without deciding, that this quoted version of the regulation is the relevant and appropriate version controlling the present dispute, it cannot broaden the reach of the statute. Because the project is neither "federally assisted" nor under the "direct or indirect jurisdiction" of any "head of any Federal Agency," we need not address the definition of "undertaking" in this regulation.

*tion Guild of Bay View v. Burnley,* 896 F.2d 985, 988 (6th Cir.1989) (Section 4(f) is applicable only to federal projects, and not state projects); *see also Quince Orchard Valley Citizens Ass'n v. Hodel,* 872 F.2d 75, 77 (4th Cir.1989) (assuming, but not deciding, that Section 4(f) does not apply to a project that has received only federal planning funds); *cf., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (The language of Section 4(f) "is a plain and explicit bar to the use of *federal funds* for construction of highways through parks—only the most unusual situations are exempted."). Here, the district court properly explained that section 4(f) does not apply because it "bars the use of *federal funds* to finance construction of highways through parks, without all possible planning to minimize harm to the park." Memorandum Opinion and Order at 13, June 9, 1987 (emphasis in original).

### 2. *Executive Order 11990*

■ Plaintiffs also argue that defendants have failed to comply with the requirements of Executive Order 11990. Specifically, appellants maintain that the defendants' action fall within the coverage of Section 1(a)(3) of Executive Order 11990. That section provides as follows:

> (a) Each agency shall provide leadership and shall take action to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the *agency's responsibilities* for ... (3) conducting Federal activities and programs affecting land use, including but not limited to water and related land resource planning, regulating, and licensing activities.

Executive Order 11990, 42 Fed.Reg. 26961 (May 24, 1977) (emphasis added). The district court held that the order was inapplicable to the challenged actions because there had not been "any significant federal participation in the river crossings project." Memorandum Opinion and Order at 12, (June 9, 1987).

We agree with the district court that Section 1(a)(3) of Executive Order 11990 does not apply in this case. Plaintiffs argue that the preparation of the EIS constituted "land resource planning." While that may be true, Executive Order 11990 only imposes obligations upon an executive agency in carrying out its *responsibilities* for land use planning. Giving that term its normal usage,[7] the federal defendants were not "responsible" for the land use planning here at issue because they did not have any ability to exercise control over the project unless the state elected to seek federal funding for the project. Because the state declined to seek such funding, it was free to reject whatever federal location advice was offered in connection with the preparation of the EIS. Thus, the district court correctly concluded that the defendants' limited involvement in this project is insufficient federal action to trigger the requirements of Executive Order 11990.

### CONCLUSIONS

For the foregoing reasons, we AFFIRM the decision of the district court in all respects.

---

**7.** A "responsibility" is defined as "the state or fact of being ... answerable or accountable, as for something within one's power or control." *Random House College Dictionary,* 1125 (1980).