Thomasine ROSS, Stanley Ross, Anjanette Bitsie, Pamina Yellowbird, Jason Daniels, Wetlands Preservation Organization, and Kansas University Environs, Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; David Geiger, Division Administrator, Federal Highway Administration; Mark Buhler, Tom Taul, Dean Neider, Douglas County, Kansas Commissioners; and E. Dean Carlson, Secretary of the Kansas Department of Transportation, Defendants.

Civil Action No. 97–2132–GTV.

United States District Court,
D. Kansas.

July 17, 1997.

**554**

Robert V. Eye, Irigonegaray & Associates, Topeka, KS, Bruce M. Plenk, Lawrence, KS, for plaintiffs.

Helen Mountford, Federal Highway Administration, Kansas City, MO, Jackie A. Rapstine, Office of U.S. Attorney, Topeka, KS, for Federal Highway Administration, Division Administrator of Federal Highway Administration.

Timothy P. Orrick, Mark Parkinson, Parkinson, Foth & Reynolds, Lenexa, KS, for Commissioners of Douglas County, Kansas.

Daniel D. Crabtree, Stinson, Mag & Fizzell, P.C., Overland Park, KS, Vicky S. Johnson, Michael B. Rees, Office of Chief Counsel, Gelene D. Savage, Kansas Dept. of Transp., Topeka, KS, Stephen P. Chinn, Patricia A. Konopka, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for Secretary of Kansas Dept. of Transp.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

█ In this case, plaintiffs allege that defendants are violating the National Environmental Policy Act (NEPA), specifically 42 U.S.C. §§ 4331–4335, by continuing construction of the South Lawrence Trafficway in Douglas County, Kansas prior to completing a supplemental environmental impact statement (SEIS). In their amended complaint, plaintiffs seek judicial review pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*, mandamus relief pursuant to 28 U.S.C. § 1361,[1] declaratory relief pursuant to 28 U.S.C. § 2201, and injunctive relief pursuant to 28 U.S.C. § 2202. For the reasons set forth below, the court finds that it has subject matter jurisdiction and is, therefore, prepared to rule upon the merits of the case. Accordingly, the court issues an injunction prohibiting defendants from taking any action or expending any funds to complete the eastern leg of the Trafficway before completing the SEIS process, issuing a final SEIS, and entering a new Record of Decision.

### Procedural Background

Plaintiffs filed their complaint and motion for preliminary injunction on March 12, 1997.[2] At a March 28, 1997 hearing, the court focused upon plaintiffs' claims against the Federal Highway Administration and Division Administrator David Geiger (federal defendants) to determine if the court has subject matter jurisdiction. NEPA applies to federal agencies undertaking "major federal actions significantly affecting the quality of the human environment". 42 U.S.C. § 4332(2)(C); *see Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1480 (10th Cir.1990) ("The requirements of

---

1. "The availability of a remedy under the APA technically precludes [plaintiffs'] request for a writ of mandamus." *Mt. Emmons Mining Co. v. Babbitt,* 117 F.3d 1167, 1170 (10th Cir.1997).

2. There have been two previous cases involving the Trafficway. In *Northern Crawfish Frog (Rana Areolata Circulosa) v. Federal Highway Admin.,* 858 F.Supp. 1503 (D.Kan.1994), the plaintiffs requested an injunctive order halting acquisition of right-of-way and construction activity of the Trafficway until the Federal Highway Adminis-

tration (FHWA) adopted a new route that did not require taking protected park land, and until the FHWA prepared and approved a supplemental environmental impact statement. Judge Crow granted the FHWA's motion for summary judgment. In *Kansas Natural Resource v. Federal Highway Admin.,* No. 95–2495–GTV (D.Kan. Nov. 9, 1995), the court denied the plaintiffs' preliminary injunction motion for a "town hall" rather than the scheduled "open house" public hearing.

NEPA apply only when the federal government's involvement in a project is sufficient to constitute 'major federal action.' "). The court, therefore, observed that its subject matter jurisdiction is contingent upon a finding of "major federal action" in the Trafficway not yet constructed.

At the March 28 hearing, the court also commented that plaintiffs seeking to enforce the procedural requirements of NEPA, which contains no private cause of action, are subject to the APA's judicial review provisions. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 882–83, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990); *Committee to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 448 (10th Cir.1996); *Catron County Bd. of Comm'rs v. United States Fish & Wildlife* Serv., 75 F.3d 1429, 1434 (10th Cir.1996); *Southern Utah Wilderness Alliance v. United States Forest Serv.,* 897 F.Supp. 1394, 1397 n. 1 (D.Utah 1995). The court concluded that federal defendants' actions at issue would be reviewed under the APA and modified the briefing schedule outlined in D.Kan.R. 83.7 to accommodate the final hearing scheduled for early May. (Doc. 14.) The court then authorized a preliminary injunction (Doc. 12), which was memorialized in an order filed April 15, 1997 (Doc. 21).

The court conducted a final hearing on May 2, 1997, during which the court noted that its subject matter jurisdiction is intertwined with the merits of the action. Accordingly, both the merits of plaintiffs' claims against federal defendants as well as the court's subject matter jurisdiction over plaintiffs' claims revolve around federal defendants' conclusion that the unconstructed Trafficway involved no "major federal action." [3] If jurisdiction is lacking, the court noted that it would dismiss federal defendants and that it lacked authority to exercise supplemental jurisdiction over the state and local defendants. *See Tatum v. Everhart,* 954 F.Supp. 225, 230 (D.Kan.1997). At the conclusion of the May 2 hearing, the court continued the preliminary injunction pending submission of additional briefing by the parties and the court's resolution of the issues contained therein. (Doc. 33.)

The case is now before the court to determine subject matter jurisdiction and, upon a finding of jurisdiction, the merits of issuing an injunction. The court has considered the arguments of counsel and the evidentiary submissions. Judicial review under the APA is limited to the administrative record with limited exceptions. The exception pertinent here is the necessity for background information. *See Northern Crawfish Frog (Rana Areolata Circulosa) v. Federal Highway Admin.,* 858 F.Supp. 1503, 1508 n. 6 (D.Kan.1994) (citations omitted). Accordingly, the court bases its factual findings upon the administrative record in this case as well as uncontroverted findings from *Northern Crawfish Frog,* a previous case involving the Trafficway.

Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Interest in a southern bypass trafficway around Lawrence began in 1964, and numerous studies were conducted by consultants as well as local, state, and federal agencies.

2. In April 1986, the Federal Highway Administration (FHWA) became involved in the Trafficway project and informed Douglas County and the Kansas Department of Transportation (KDOT) that eligibility for federal funding necessitated preparation of an environmental impact statement (EIS). On June 23, 1986, the FHWA published a Notice of Intent to Prepare an EIS for the Trafficway in the Federal Register.

3. The Trafficway was conceived as a federal-aid highway project jointly funded by local, state, and federal monies. In a federal-aid highway project, state and local officials contract for the actual planning and construction work, subject to the FHWA's

---

**3.** At the May 2 hearing, the court granted plaintiffs' uncontested motion for leave to file an amended complaint in which plaintiffs allege the APA as a jurisdictional basis, correcting their

previous oversight. *See Committee to Save the Rio Hondo,* 102 F.3d at 448 (plaintiffs seeking to enforce NEPA's procedural requirements must rely upon the APA as the basis for their action).

oversight. The FHWA reimburses the state for eligible costs expended on contracts into which state and local officials have entered.

4. On January 4, 1990, the FHWA approved and released to the public a final EIS. On June 5, 1990, the FHWA issued a Record of Decision, selecting the route for the eastern leg of the Trafficway along the existing 31st Street in the City of Lawrence. On April 22, 1993, the United States Army Corps of Engineers (Corps) issued a section 404 permit pursuant to the Clean Water Act for the 31st Street route.[4]

5. In July and October 1993, representatives of Haskell Indian Nations University expressed concern about the 31st Street alignment that is adjacent to the Haskell campus. Following a Haskell Board of Regents' resolution opposing the 31st Street alignment, the FHWA, KDOT, and Douglas County determined that a SEIS was needed to address Haskell's spiritual, academic, and development concerns.

6. In April 1994, to facilitate construction phasing and available funding limits, KDOT requested that FHWA allow segmentation of the Trafficway. In May 1994, the FHWA approved KDOT's request to divide the Trafficway into four segments with three segments on the western leg (Kansas Turnpike south to U.S. 40, U.S. 40 south to Clinton Parkway, and Clinton Parkway south and west to U.S. 59) and the remaining segment being the eastern leg, east of U.S. 59. Citing 23 C.F.R. § 771.111(f), the FHWA determined that segmentation provided logical termini, that each segment had independent utility, and that construction of the western segments would not foreclose alternatives for the eastern segment. The three segments of the western leg of the Trafficway have been constructed and are carrying traffic.

7. On October 17, 1994, the FHWA published a Notice of Intent to Prepare a SEIS to address Haskell's concerns. Department of Transportation Notice, 59 Fed.Reg. 52,360 (1994). Approximately one year later, on October 2, 1995, a draft SEIS addressing the eastern leg of the Trafficway was released for public comment. On November 8, 1995, a public hearing was held, at which over 633 people attended. There were 280 written comments, 180 oral comments, and 5 petitions submitted.

8. Cooperating agencies never reached agreement on a preferred alignment to 31st Street. On October 29, 1996, FHWA, Corps, KDOT, and Douglas County discussed defederalizing the project.

9. On December 9, 1996, Douglas County wrote the FHWA, commenting that the SEIS process was "deadlocked" and that the FHWA had yet "to take a stand in writing on any of the three alignments." (Administrative Record Ex. 16.) Douglas County asked that the "FHWA give [its] position in writing and recommend a method to conclude the SEIS process." (AR Ex. 16.)

10. On January 10, 1997, KDOT and Douglas County entered into an agreement to construct the eastern leg of the Trafficway without federal funds. On February 10, 1997, KDOT informed the FHWA of KDOT and Douglas County's agreement, stating that KDOT hoped this information resolved "the question of any further involvement by the [FHWA]." (AR Ex. 19.)

11. On February 4, 1997, plaintiffs' counsel wrote federal defendants and others, asking that the FHWA and Environmental Protection Agency (EPA) take "steps to prevent the expenditure of any additional funds or the undertaking of any construction activities by Douglas County and/or KDOT" on the eastern leg of the Trafficway "until the completion of the [SEIS] and the filing of a new Record of Decision determining an alignment based on the [SEIS]." (AR Ex. 18.)

12. On February 14, 1997, the EPA wrote the FHWA, acknowledging that the EPA's statutory authority to prevent expenditure of funds prior to completion of the SEIS was limited. Nonetheless, EPA shared its belief that "the NEPA process should be completed . . . ."[5] (AR Ex. 17.)

---

4. The Clean Water Act provides that dredge or fill material may not be discharged into waterways, including wetlands, without a section 404 permit from the Corps. See 33 U.S.C. § 1344(a).

5. Although the letter is dated January 14, 1997, federal defendants allege that the date was actually February 14, 1997.

13. On February 21, 1997, the FHWA responded to plaintiffs' counsel's letter, stating that KDOT and Douglas County had agreed to complete the eastern leg of the Trafficway without federal funds and that such agreement was in accord with 23 U.S.C. § 145, which authorizes states to decide which highway projects will include federal funding. Division Administrator David Geiger concluded the letter, observing: "Since no Federal-aid highway funds will be used on the proposed project, we know of no provision in any applicable Federal law or regulation that would allow FHWA to take any of the actions you have requested." (AR Ex. 22.)

14. Also on February 21, 1997, FHWA informed Douglas County that, based upon the agreement between Douglas County and KDOT, "the FHWA will no longer be the lead federal agency for the project." [6] (AR Ex. 21.) On March 6, 1997, FHWA published a Notice of Withdrawal of Intent to Complete a Supplement to the Final EIS in the Federal Register, citing KDOT and Douglas County's agreement not to use federal funds for the project. "Therefore, FHWA is no longer the lead Federal agency for this project and is discontinuing the Supplemental Environmental document process." Department of Transportation Notice, 62 Fed.Reg. 10,305 (1997).

15. Also on March 6, 1997, the Corps wrote Douglas County, noting that since the FHWA's withdrawal, the "Corps is the only Federal agency with statutory authority for the remaining work," but that its role "is more focused than the FHWA role because [its] authority is limited to [its] Clean Water Act jurisdiction." (AR Ex. 23.)

16. Federal funds in the amount of $10,-404,040 have been expended on the Trafficway. All federal funds, with the exception of the $108,300 spent on the Santa Fe Mitigation Site,[7] have been expended on the western segments.

17. On March 12, 1997, plaintiffs filed the above-captioned case, alleging that defendants' defederalization of the eastern leg of the Trafficway is an attempt to circumvent the mandates of NEPA. Plaintiffs seek a declaratory judgment that defendants must complete the SEIS process and issue a new Record of Decision prior to planning, expending, or contracting for the expenditure of funds on the eastern leg of the Trafficway. Plaintiffs also seek injunctive relief that prohibits defendants from planning, expending, or contracting for the expenditure of funds on the eastern leg of the Trafficway prior to completing the SEIS process, issuing a new Record of Decision, and entry of a new Record of Decision.

## Conclusions of Law

### I. Subject Matter Jurisdiction

As previously noted, the court first must address the question of subject matter jurisdiction. "A court lacking jurisdiction ... must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Laughlin v. Kmart Corp.*, 50 F.3d 871, 872 (10th Cir.) (internal quotations and citation omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 174, 133 L.Ed.2d 114 (1995); *see* Fed.R.Civ.P. 12(h)(3). Federal courts are courts of limited jurisdiction. The party seeking the federal forum must establish the basis for the court's jurisdiction. *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 551 (10th Cir.1992). United States district courts have original jurisdiction over actions arising under the laws of the United States. 28 U.S.C. § 1331. Here, plaintiffs seek an APA

---

**6.** Federal defendants contend that they anticipated that KDOT and Douglas County would request additional federal funds for the eastern leg of the Trafficway. This contention is based upon an August 24, 1995 letter on FHWA letterhead to Beverley Worster of the Coalition to Preserve Our Wetlands, stating that KDOT "plans to use Federal-aid funds for construction of the trafficway, but is using only State funds for preliminary engineering and right-of-way acquisition." (AR Ex. 11.)

**7.** Mitigation of 11.89 acres that the 31st Street alignment would impact has been accomplished at a triangular area north of 35th Street and east of Haskell. The construction of a water level control device in this area has the potential of flooding 15.3 acres in the off-site location. This creation of wetlands resulted in a net gain of 3.41 acres of wetlands.

review of federal defendants' actions allegedly in violation of NEPA.

## A. APA

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see Catron County Bd. of Comm'rs*, 75 F.3d at 1434 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882–83, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990)). Plaintiffs seek an APA review of federal defendants' actions (1) discontinuing the SEIS and thereby ending the NEPA process for the eastern leg of the Trafficway, (2) withdrawing as lead NEPA agency without arranging for another federal agency to complete the NEPA process, and (3) modifying the previously filed Record of Decision for the Trafficway. (Doc. 20, at 12.) The APA authorizes the reviewing court to "compel agency action unlawfully withheld" and to "hold unlawful and set aside agency actions, findings, and conclusions," which the court finds to be, as plaintiffs allege here, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), § 706(2)(A); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (scope of APA judicial review of agency action); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573–75 (10th Cir.1994) (same).

## B. NEPA

Congress enacted NEPA "to protect and promote environmental quality. To ensure this protection, [NEPA] establishes 'action forcing' procedures the agencies must follow, such as requiring an agency to prepare either an [EIS] or a [SEIS] under certain circumstances." *Committee to Save the Rio Hondo*, 102 F.3d at 448 (citing 42 U.S.C. §§ 4331(a–c), 4332(2)(C)(i–v)); 40 C.F.R. § 1502.9(c)(1)(i)). An EIS or a SEIS details "the environmental impact of the action; unavoidable adverse environmental effects; alternatives to the action; relationship between the short-term uses and long-term productivity of the affected environment; and irretrievable and irreversible commitments of resources should the action be implemented." *Catron County Bd. of Comm'rs*, 75 F.3d at 1434 (citing 42 U.S.C. § 4332(2(c)(i–v)). One purpose of the EIS or SEIS is to allow "critical evaluation of an agency's actions by those outside the agency." *Id.* (citation omitted). NEPA mandates a particular process, not a particular outcome. *Committee to Save the Rio Hondo*, 102 F.3d at 448; *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir.1989).

As previously noted, NEPA can be invoked only if major federal action has affected significantly the quality of the human environment. 42 U.S.C. § 4332(2)(C). The Tenth Circuit has construed the implementing regulations defining major federal action "to encompass not only actions by the federal government but also nonfederal actions ' "with effects that may be major and which are potentially subject to Federal control and responsibility." ' " *Village of Los Ranchos de Albuquerque*, 906 F.2d at 1482 (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir.1988) (citing 40 C.F.R. § 1508.18)).

## C. Discussion

Under an APA review, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Olenhouse*, 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983)); *see Industrial Union Dep't, AFL–CIO v. American Petroleum Inst.*, 448 U.S. 607, 631 n. 31, 100 S.Ct. 2844, 2858, 65 L.Ed.2d 1010 (1980). According to the administrative record before the court, federal defendants withdrew from the project because KDOT and Douglas County agreed not to use federal-aid highway funds for the eastern leg of the Trafficway (with the exception of the $108,000 spent on the mitigation site). Federal defendants determined there was no major federal action because there would be no federal funding of the eastern leg. Such determination was in accord with 23 U.S.C. § 145, according to federal defendants, because "it is the State's decision to determine on which projects [the State] will use [its] limited Federal-aid highway funds." (AR

Ex. 22.) Section 145, which is part of the Federal–Aid Highway Act, 23 U.S.C. § 101 *et seq.*, states: "The authorization of the appropriation of Federal funds or their availability for expenditure under this chapter shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed. The provisions of this chapter provide for a federally assisted State program."

The Federal–Aid Highway Act provides "financial aid for approved state highway construction projects." *Miller v. United States*, 710 F.2d 656, 659 (10th Cir.1983). "The states own, construct, and maintain the highways which form the federal-aid highways within their borders. The statutory and regulatory criteria for federal-aid highway funding is an elaborate, intricate scheme." *Save Barton Creek Ass'n v. Federal Highway Admin.*, 950 F.2d 1129, 1134 n. 6 (5th Cir.1992). Based upon these criteria, the FHWA apportions the authorized money in the form of certificates among the states. Mike Mills, *Highway Bill Debates Becomes War Between the States*, Cong.Q. 1487, 1487–88 (June 8, 1991). A state seeking federal-aid highway funds must submit proposed projects for approval. *Miller*, 710 F.2d at 659–60. The FHWA is responsible for administering the federal-aid highway program, but "does not plan, design or locate highways." *No East–West Highway Comm., Inc. v. Whitaker*, 403 F.Supp. 260, 273–74 (D.N.H. 1975).

On April 2, 1987, Congress allocated funds for the Trafficway as a demonstration and priority highway project

in Douglas County, Kansas, to demonstrate methods of reducing traffic congestion and facilitating the usage by motorists on the Interstate System of recreational facilities by construction of a north-south limited access trafficway of approximately 4 miles in length which will connect an east-west interstate route to a reservoir and a university research park.

Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA), Pub.L. No. 100–17, § 149(a)(72), 1987 U.S.C.C.A.N. (101 Stat.) 132, 192. Congress appropriated a total of $7.2 million for the Trafficway. *Id.* § 149(b)(72), § 149(d). On December 22, 1987, Congress amended section 149(a)(72) to expand the road to

approximately 14 miles in length which, at its western terminus, will provide access from an east-west Interstate highway route to a reservoir and a university research park, will proceed easterly around the southern portion of the City of Lawrence and, at its eastern terminus, will provide access to a business park and a limited access east-west State highway.

Department of Transportation and Related Agencies Appropriations Act of 1988, Pub.L. No. 100–202, § 345, 1987 U.S.C.C.A.N. (101 Stat.) 1329, 1329–358, 1329–387 to 1329–388. On December 18, 1991, as part of the rural access projects, Congress appropriated an additional $3.3 million for the years 1992 through 1997 for a "Lawrence Circumferential Roadway." Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), Pub.L. No. 102–240, § 1106(a)(2) ¶ 102, 1991 U.S.C.C.A.N. (105 Stat.) 1914, 2041.

Plaintiffs' key argument is that the Trafficway, a congressionally mandated highway demonstration project, cannot be defederalized, and that federal defendants' reliance upon 23 U.S.C. § 145 to discontinue the SEIS process is contrary to established law. Plaintiffs distinguish between demonstration projects and "normal" federal-aid highway projects, which plaintiffs liken to block grants: In the latter scenario, the state prioritizes the projects to submit to the FHWA for approval, and the allotted apportionment is not designated for any particular project. In contrast, demonstration projects are specific highway projects that Congress has selected and are not within the discretion of state highway departments. *See Where the Money Goes*, Cong.Q. 127, 128 (Dec. 7, 1991) ("[S]tate transportation officials often dislike [demonstration] projects because they bypass the traditional highway funding method of lump-sum grants, which let states decide how to spend the money.... Members of Congress defend the spending, saying they often know local road needs better than state transportation officials."); Mike Mills, *Demonstration Projects Survive in House Transportation Bill*, Cong.Q.2066, 2066 (July 27,

1991) ("Lawmakers increasingly use [demonstration projects] to steer federal dollars toward specific local road projects, bypassing the traditional formula funding process.").

Plaintiffs contend that because Congress authorized demonstration funds for the entire fourteen miles of the Trafficway, the entire Trafficway is major federal action regardless of how and where the federal funds have been spent. Plaintiffs claim that state and local officials cannot spend the federal demonstration funds in a different manner or on a different project than Congress authorized. *See* Mike Mills, *House Travels Favorite Road to Funding Local Highways,* Cong. Q. 1884, 1884 (July 13, 1991) (demonstration projects "bypass funding projects preferred by state planners and often leave local governments with no choice but to scrape together matching funds to build the projects"). Plaintiffs assert that federal defendants maintain control over the project by virtue of the Trafficway being a demonstration project. Finally, plaintiffs suggest the eastern leg of the Trafficway may be defederalized only if all federal funds expended on the entire project are reimbursed to the federal government. *See Ely v. Velde,* 497 F.2d 252, 257 (4th Cir.1974); *Hall County Historical Soc'y v. Georgia Dep't of Transp.,* 447 F.Supp. 741, 752 (N.D.Ga.1978).

In response, federal defendants assert that there is no major federal action because no federal funds have been requested or approved for constructing the eastern leg of the Trafficway and the Trafficway has been segmented into independent projects.

Federal defendants dispute that demonstration projects such as the Trafficway are not subject to the state sovereignty provisions of 23 U.S.C. § 145. Citing STURAA § 149(i) and ISTEA § 1106(a)(7), federal defendants argue that Congress did not intend for these acts to preempt the Federal–Aid Highway Act, including 23 U.S.C. § 145, or its implementing regulations allowing segmentation, including 23 C.F.R. § 771.111(f). Under both STURAA and ISTEA, Congress specified that

> [f]unds authorized by this section shall be available for obligation in the same manner as if such funds were apportioned under chapter 1 of title 23, United States Code, except that the Federal share of the cost of any project under this section shall be determined in accordance with this section and such funds shall remain available until expended. Funds authorized by subsections (b) and (c) shall not be subject to any obligation limitation.

STURAA § 149(i); *accord* ISTEA § 1106(a)(7) (virtually identical language).

Federal defendants also argue that there is nothing in STURAA § 149 clearly stating that by accepting demonstration funds, the state is prohibited from segmenting the Trafficway for expenditure and NEPA purposes. *See Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 24, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981) ("Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds.")

Finally, to the extent STURAA and ISTEA are ambiguous concerning either the applicability of 23 U.S.C. § 145 or the appropriateness of imposing conditions on federal funds to states, federal defendants assert that the court must defer to federal defendants' statutory interpretation. *See, e.g., Smiley v. Citibank (S.D.),* — U.S. —, —, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering.").

The administrative record does not support federal defendants' emphasis on segmentation as a basis for finding no major federal action. The Trafficway was divided into four segments in 1994 to facilitate construction phasing and available funding limits. Defendants did not discuss making the eastern leg a non-federal project (i.e., defederalizing) until approximately two years after segmentation occurred. The court finds the segmentation argument to be "[a]fter-the fact rationalization," upon which the court cannot rely. *Olenhouse,* 42 F.3d at 1575 (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 50, 103 S.Ct. at 2870).

■ Neither party cites any case law discussing demonstration highway projects in the NEPA context, and the court has found none. The court, therefore, bases its decision on the unambiguous statutes at issue here. "If a statute is clear and unambiguous, the court must interpret the statute to effect the unambiguous intent of Congress, regardless of the interpretation given to the statute by an administrative agency with responsibility for enforcement." *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir.1997). In such a scenario, the court's inquiry ends and the plain meaning of the language is conclusive except in the rare case not at issue here. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989) *United States v. Brown*, 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948).

The language of STURAA § 149(i) and ISTEA § 1105(a)(7) communicates Congress' clear intent that demonstration projects such as the Trafficway be treated differently than other federal-aid highway projects.[8] These provisions dictate that authorized demonstration funds shall be available in the same manner as authorized funds under the Federal–Aid Highway Act. STURAA § 149(i) and ISTEA § 1105(a)(7) instruct how the funds will be administered; they do not invoke the state sovereignty provision of 23 U.S.C. § 145. To find to the contrary would eliminate demonstration projects for all intents and purposes. Although demonstration projects are waning in popularity, *see* 143 Cong. Rec. H3358–01, H3370, § 338, Sense of the Senate on Highway Demonstration Projects (June 4, 1997), the virtue of demonstration projects is not before the court.

Pursuant to STURAA and ISTEA, Congress appropriated over $10 million in demonstration funds for a fourteen-mile Trafficway, not a four-mile nor a ten-mile highway. The conditions attached to the grant of federal funds to the state are unequivocal. The federal funds are to be expended on the described project. The court finds that the entire Trafficway is major federal action over which federal defendants have " 'the ability to influence or control the outcome in material respects.' " *Village of Los Ranchos de Albuquerque*, 906 F.2d at 1482 (quoting *Sierra Club*, 848 F.2d at 1089). Accordingly, the court finds that federal defendants' actions at issue were not in accordance with the law.

Because the entire Trafficway, including the unconstructed eastern leg, is major federal action, the court has subject matter jurisdiction over the case. Before examining plaintiffs' request for injunctive relief, the court briefly will address plaintiffs' standing to bring the case.

## II. Standing

Standing is a threshold issue and jurisdictional requisite for bringing a case in federal court, *United States v. McVeigh*, 106 F.3d 325, 334 (10th Cir.1997), a "bedrock requirement," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). "To meet the standing requirements of Article III, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Raines v. Byrd*, —— U.S. ——, ——, 117 S.Ct. 2312, 2317, 138 L.Ed.2d

8. President Reagan vetoed STURAA, voicing his disapproval of "pork barrel spending" in the form of

add-on funding for 152 highway special interest projects.... The total cost to complete these highway projects is estimated to be $5.5 billion, and they have not even been selected through the established Federal-aid highway program mechanism that relies on the expertise of State and local officials. In fact, there is virtually no hearing record and related analyses regarding the merits of these projects. The States, not the Congress should determine their highway program needs.

*Reagan Veto Stalls Highway Bill: A Text*, Cong.Q. 607, 607 (Apr. 4, 1987). The Senate overrode the presidential veto. Paul Starobin, *Highway Bill Veto Overridden After Close Call in the Senate*, Cong.Q. 604, 604–06 (Apr. 4, 1987).

President Bush signed ISTEA into law, despite his dissatisfaction with the funding of demonstration projects, which, as one commentator observed, preempt "some state and local government authority over project selection by adding 538 demonstration projects not subject to the review of federal, state, or local governmental officials." Robert Jay Dilger, *ISTEA: A New Direction for Transportation Policy*, 22 Publius 67, 77 (1992).

849 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984)). In addition to constitutional standing requirements, plaintiffs must establish that final agency action caused them to suffer "an injury in fact falling within the 'zone of interests'" that NEPA protects. *Committee to Save the Rio Hondo*, 102 F.3d at 448 (citations omitted).

■ The court has examined the complaint [9] and is persuaded that plaintiffs have alleged a concrete and particularized injury capable of being resolved through the judicial process. The court also finds that plaintiffs have alleged injury falling within the NEPA-protected "zone of interests." *See Raines*, —— U.S. at ——–——, 117 S.Ct. at 2317–18; *Committee to Save the Rio Hondo*, 102 F.3d at 447–52.

### III. Injunction

■ Having established subject matter jurisdiction and standing, the court will proceed to the merits of the case. Plaintiffs ask the court to convert the preliminary injunction into permanent injunctive relief. If this court should make its injunction permanent, it would last only as long as it takes federal defendants to complete the SEIS process, issue a final SEIS, and enter a new Record of Decision.

As evinced in the discussion concerning subject matter jurisdiction, plaintiffs have demonstrated that the Trafficway is major federal action and that defendants are violating NEPA by failing to complete the SEIS process for the unconstructed portion of the Trafficway. Plaintiffs have established a statutory violation.

■ The court, however, "is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). It is fundamental "that an injunction is an equitable remedy that does not issue as of course." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987) (citing *Weinberger*, 456 U.S. at 311, 102 S.Ct. at 1802–03). Unless the statute in question, either expressly or by "necessary and inescapable inference," limits the court's equity jurisdiction, issuance of injunctive relief is within the court's discretion. *Weinberger*, 456 U.S. at 313, 102 S.Ct. at 1803–04. Courts have concluded that NEPA does not limit the court's equity jurisdiction. *See, e.g., Wilderness Soc'y v. Tyrrel*, 701 F.Supp. 1473, 1477 (E.D.Cal.1988), *rev'd on other grounds*, 918 F.2d 813 (9th Cir. 1990); *Friends of the Earth v. Hall*, 693 F.Supp. 904, 948–49 (W.D.Wash.1988).

■ "In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." [10] *Amoco Prod. Co.*, 480 U.S. at 542, 107 S.Ct. at 1402 (citing *Weinberger*, 456 U.S. at 311–13, 102 S.Ct. at 1802–04). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 545, 107 S.Ct. at 1404. Additionally, courts must factor the public interest into the equitable equation. *Id.*

Plaintiffs contend that they have no adequate remedy at law and will suffer irrepara-

9. According to the allegations in the complaint, the individual plaintiffs utilize the southern portion of the Haskell campus, which is adjacent to the proposed 31st Street alignment, for spiritual practice and solitude, for recreational use, for aesthetic purposes, and/or for environmental studies. The membership of plaintiffs Wetlands Preservation Organization and Kansas University Environs utilizes the wetlands for spiritual, religious, educational, and environmental purposes. All plaintiffs allege that completion of the Trafficway as presently planned will create pollution, litter, traffic, noise, lights, and other effects, interfering with their use of the land.

10. The Supreme Court noted that "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co.*, 480 U.S. at 546 n. 12, 107 S.Ct. at 1404 n. 12.

ble injury if, prior to completion of the Trafficway's eastern leg, full consideration of the environmental impact to their use of the adjacent lands does not occur. Plaintiffs emphasize the uniqueness of and the 100–year traditions associated with the land at issue.

The court agrees that construction of the eastern portion of the Trafficway as presently planned will result in a permanent alteration to the environment. "An environmental injury usually is of an enduring or permanent nature, seldom remedied by money damages and generally considered irreparable." *Catron County Bd. of Comm'rs*, 75 F.3d at 1440 (citing *Amoco Prod. Co.*, 480 U.S. at 545, 107 S.Ct. at 1404).

Plaintiffs also maintain that the additional time required to finalize a substantially complete draft of the SEIS is minimal, considering that the Trafficway has been in the planning stage for over twenty years and in the environmental review stage for over nine years. Plaintiffs further allege that completion of the SEIS will not harm third parties because defendants have not yet purchased land east of U.S. 59.

Defendants argue that delays in construction run the potential for increased land and construction costs should the highway be built later. Plaintiffs dispute that such an argument outweighs their interests. *See Highland Coop. v. City of Lansing*, 492 F.Supp. 1372, 1382 (W.D.Mich.1980) ("While the delay in a construction project will almost invariably result in an increase in the eventual costs, those costs cannot be said to be a substantial harm."). Plaintiffs further claim that if a final SEIS recommends a different route for the eastern portion of the Trafficway, defendants will save money that would have been spent on roadway designs and land acquisitions for a "ghost highway."

Defendants also suggest that any delay will jeopardize the public safety because existing roads are unable to accommodate the current level of traffic. Public safety is certainly a concern; however, defendants have not established that the danger of existing roadways is so imminent that it outweighs all other concerns.

Plaintiffs assert that it is not in the public interest to begin construction on one route when the impact statement regarding route selection is pending. *See Dickman*, 724 F.Supp. at 1348. Such action, according to plaintiffs, cannot not be in the public interest because such action violates NEPA public policy and implementing regulations. *See Park County Resource Council, Inc. v. United States Dep't of Agric.*, 817 F.2d 609, 620 (10th Cir.1987) ("NEPA ... reflects an important public policy of this nation: the avoidance of precipitous federal decision making at the agency level which may fail to adequately consider the environmental ramifications of agency actions."), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992); *Northern Crawfish Frog*, 858 F.Supp. at 1506 ("'major Federal actions significantly affecting the quality of the human environment' must be preceded by an environmental impact statement") (internal quotations and citations omitted); 40 C.F.R. § 1506.1.

Defendants contend that an injunction harms the public interest because plaintiffs' true goal is derailment of the eastern portion of the Trafficway, an objective that puts public safety at risk. Defendants' contention is speculative. Plaintiffs' satisfaction or dissatisfaction with the yet-to-be selected route for the eastern leg of the Trafficway is not the issue before the court.

The court finds plaintiffs' arguments persuasive. Plaintiffs have demonstrated their entitlement to injunctive relief.

IT IS, THEREFORE, BY THE COURT ORDERED that all defendants are enjoined from taking any action and expending any funds on the eastern leg of the Trafficway prior to completion of the supplemental environmental impact statement process, issuance of a final supplemental environmental impact statement, and entry of a new Record of Decision.

The case is now closed.

**IT IS SO ORDERED.**